THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MAX SILVERMAN, Defendant, Impleaded with BENJAMIN N. SPEVACK, HAROLD SILVERMAN, WILLIAM GOLDIS (Alias WOLFIE GOLDIS) and SAMUEL SCHORR, Appellants.

First Department, April 14, 1938.

*Edmond B. Butler* of counsel [*Rice & Maguire,* attorneys], for the appellants William Goldis and Samuel Schorr.

*Caesar B. F. Barra* of counsel [*Ralph J. Barra* and *Morris Spevack* with him on the brief], for the appellant Benjamin N. Spevack.

*Sol A. Klein,* for the appellant Harold Silverman.

*Barent Ten Eyck, Assistant District Attorney,* of counsel [*Felix C. Benvenga* and *E. G. Stoddard, Assistant District Attorneys,* with him on the brief; *Thomas E. Dewey, District Attorney*], for the respondent.

CALLAHAN, J. The appellants were charged with having conspired with each other, with Max Silverman (not apprehended) and with one Alex Rubinstein, to prevent others from exercising a lawful trade, and to commit acts injurious to trade and commerce. (Penal Law, § 580.)

An association, known as " United Cake, Pastry and Pie Bakers Association, Inc.," was incorporated in the late months of 1934, by a number of men engaged in the baking business. The object of United Cake, Pastry and Pie Bakers Association, Inc., was to cause manufacturers engaged in the cake and pastry baking business to become members of the association, to control the fixation of prices, and to maintain rules for the operation of the business of its members.

It was charged, in substance, and amply established, that unlawful means were pursued to carry out the objects of this association, in that intimidation, by way of calling strikes, and violence, through the destruction of property, were resorted to.

Rubinstein was the one who conceived the idea of forming the association. There had been other similar organizations in the past, but they had not proved successful. The manufacturers were told that " this association would be more effective, because it would have teeth in it." Reference was made to the fact that Max Silverman, who termed himself a " labor adjuster," was to lend his services to the United. Silverman's reputation for ability to control labor unions was called to the attention of the proposed members.

The defendant Spevack was an attorney recommended by Max Silverman. He incorporated United and continued to be active in the conduct of its affairs. He was familiar with the unlawful means resorted to in effecting its purposes.

The defendant Harold Silverman, a son of Max Silverman, was employed in carrying out the work of the association.

Defendants William Goldis and Samuel Schorr were officers of Local 138 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers. The drivers of bakery wagons and routes were employees who came within the purview of this union.

There was another defendant, Nathan Ehrlich, who was the business manager of the Joint Auxiliaries of Locals 505, 507 and 509 of the Bakery and Confectionery Workers International Union of America (inside bakers). He was tried and acquitted.

The charge, in substance, against the defendants who were union officials was that, through the intervention of Max Silverman, they lent themselves to the conspiracy by calling strikes to enforce the demands of the association rather than for legal labor purposes.

While the evidence against Goldis and Schorr was largely given by the accomplice Rubinstein, we find that Rubinstein's testimony was corroborated sufficiently to justify their conviction.

In addition to discussing the questions of the weight and sufficiency of the evidence, the appellants claim that numerous errors were committed upon the trial. We have carefully examined all of these claims. Though we find no reversible error, we deem it appropriate to discuss several of the points raised.

The appellants contend that the crime charged was barred by the Statute of Limitations. The information upon which they were tried was filed April 19, 1937. There appears to be no evidence of the commission of any overt acts in furtherance of the conspiracy after April 15, 1935. The crime charged being a misdemeanor, the two-year Statute of Limitations would have barred the prosecution (Code Crim. Proc. § 142), unless the statute was rendered inapplicable by the fact that the information on which the appellants were tried was a superseding information. There had been a prior information filed on January 18, 1937, within the two-year period. A prosecution is deemed to have been commenced when the first information is filed, where a second superseding information is resorted to. (Code Crim. Proc. §§ 144, 292-a, 742.)

Section 292-a provides: " If there be at any time pending against the same defendant, two indictments for the same offense; or two indictments for the same matter, although charged as different offenses, the indictment first found, shall be deemed to be superseded by such second indictment, and shall be set aside. (Added by L. 1909, chap. 66.) "

It is conceded that this provision applies to informations in the Court of Special Sessions of the City of New York.

Both the first and second informations filed herein were on the calendar until the conclusion of the trial. The defendants moved to dismiss the first. The trial court, instead of granting the motion, merely discharged bail thereon, though earlier in the trial the district attorney had taken the position that he deemed the second a superseding information. The failure to dismiss the first information, though erroneous, would not be determinative of the questions as to whether the second information superseded the first. This depended, under the statute, on whether the second information was for the same offense, or for the same matter as the first. A comparison of the two informations discloses that, in the first, the defendants named were Max Silverman, Benjamin N. Spevack, Harold Silverman, David Elfenbein, William Goldis and Samuel Schorr. In the second, the defendant Elfenbein's name was dropped and a new defendant, Nathan Ehrlich, was added. The

first information charged a conspiracy formed on November 21, 1934. The second charged a conspiracy continuing from November, 1934, to August, 1935.

The overt acts charged in the first information are included in the second, with but slight variations. Additional overt acts were set forth in the second information.

Summarizing the two informations, we find that the second was broader than the first, in that the first was based on a conspiracy to put a single concern, known as Mur-Ray Pastry Company, out of business, whereas the second charged a conspiracy to put all non-co-operating bakers, including Mur-Ray, out of business. The inclusion in the second information of the additional defendant Erhlich (who was acquitted) did not necessarily mean that a different conspiracy was intended to be charged against appellants who were parties to both informations. The pleadings show that both charges referred to the same matter, in that everything set forth in the first charge was included in the second. The second information must be deemed to have superseded the first within the meaning of the statute.

The failure of the trial court to dismiss the first information would appear to be a mere irregularity under the circumstances. There has been no attempt to conduct any further prosecution under the first information, and it may still be dismissed.

The appellants also assert the trial court erred in finding defendants Harold Silverman, Schorr and Goldis guilty before hearing the testimony of defendant Spevack. Spevack was the only defendant who took the stand or offered testimony. The other defendants, including Ehrlich, rested on the People's case. The trial court denied the motions of all defendants, except Ehrlich, to dismiss the information at the end of the People's case. As to Ehrlich, the court reserved decision at that time, but acquitted him later. Goldis and Schorr asked for leave to withdraw from the case during the presentation of Spevack's defense. They plainly indicated that they did not desire to take part in the examination of Spevack's witnesses, or be bound by their testimony. Harold Silverman did not make any specific motion to withdraw, but like Goldis and Schorr, he rested before Spevack's testimony was received, knowing that Spevack was to call witnesses. The court thereupon found the defendants Harold Silverman, Schorr and Goldis guilty before the receipt of Spevack's testimony. None of the defendants objected to this procedure on the ground that the disposition of the case as to them was premature. The question is whether there was any prejudicial error committed as to any of the appellants by the procedure adopted. We think not. Obviously the appellants

acquiesced in what was done. They may not now assert that they were harmed by the procedure followed, especially since it appears that no injustice occurred. The court evidently did not credit Spevack's testimony in his own behalf. He offered very little evidence that referred to the other appellants, and what was received relating to them would not appear to warrant any change in the verdict as to their guilt. By this ruling we do not wish to indicate approval generally of the procedure followed on the trial. We merely hold that it did not constitute reversible error, in view of the positions taken by the defendants.

The trial of this action took place prior to the amendment to section 211 of the Civil Practice Act, effective September 1, 1937. At the time of the trial it was permissible in a civil action for one defendant to withdraw during the presentation of testimony by codefendants, and thus avoid having such testimony considered as against the withdrawing defendant. (See *Bopp* v. *N. Y. Electric Vehicle Transportation Co.*, 177 N. Y. 33; *Thomas* v. *Nassau Electric R. R. Co.*, 185 App. Div. 326; *Notter* v. *Union R. Co. of New York City*, 247 id. 140.)

We need not decide whether that rule applicable to civil actions applied to the trial of the present criminal case. (See Code Crim. Proc. § 392.) Assuming that it did apply, it would in nowise affect the questions raised by these appellants. Only Ehrlich, who was acquitted, was refused the right to withdraw. The appellants Harold Silverman, Goldis and Schorr were, in effect, treated as if the rule did apply to them, in that their guilt was determined before the receipt of the testimony offered by Spevack. Clearly there was no error as to said appellants by the procedure adopted.

As to Spevack, a different question is raised with respect to the correctness of the procedure followed by the trial court. He contends that there were two essential elements in the crime charged against him, *i. e.*, (1) the existence of a conspiracy, and (2) his connection with that conspiracy. Accordingly he asserts that the court prejudged the first of these elements by convicting the codefendants before Spevack's defense was heard. It seems to us, however, that the effect of the determination of the issues as to the other appellants before Spevack's testimony was received, did not prejudge Spevack's defense. It amounted merely to a finding that a conspiracy existed as to which the three defendants who rested were *particeps criminis*. By denying Spevack's motion to dismiss the information, the court further indicated that, *prima facie*, Spevack was connected with this conspiracy charged. This did not prejudice Spevack's case. The question of his guilt was

left open, not only as to his connection with the conspiracy, but as to the actual existence of a conspiracy.

If the testimony introduced by Spevack had created a reasonable doubt as to whether any conspiracy existed, it became the duty of the trial court to acquit him, though some inconsistency in the court's findings might result. We cannot assume that the adjudication of the codefendants' guilt influenced the court in considering the weight to be given to Spevack's defense. His guilt was fully established on the whole case, and we see no reason for disturbing the finding of the trial court in respect thereto.

The appellants further assert an alleged error of the trial court in refusing to hold that certain witnesses were accomplices as a matter of law. Though the trial was proceeding before three judges sitting as triers of the facts, as well as judges of the law, the defendants moved at the close of the People's case for a ruling by the court that certain of the People's witnesses were accomplices as a matter of law. The court refused to so rule, except that it did find that Rubinstein was an accomplice.

Assuming, without determining, that some of the witnesses who had admitted contributing money to carry out the unlawful purpose of the conspiracy were accomplices as a matter of law, we see no necessity for a court, constituted as the Court of Special Sessions, expressing its opinion on the legal question presented by the motion referred to. We must assume that the judges properly applied the law relating to the weight to be given to the testimony of the various witnesses.

In addition to the foregoing, appellants make several claims of error in connection with the admission of evidence. We have carefully considered all of these claims, but find no error requiring reversal. It does appear that the court improperly received evidence from a witness, Hartman, who was permitted to testify as to a telephone conversation with "one of the Schorrs," meaning either the defendant Samuel Schorr, or his brother Max, who was not a defendant. However, in view of the weight of the competent evidence establishing Samuel Schorr's guilt, this single instance of error in a long and difficult trial should be disregarded, in accordance with the mandate of section 542 of the Code of Criminal Procedure.

The judgment should in all respects be affirmed.

MARTIN, P. J., TOWNLEY and COHN, JJ., concur; DORE, J., dissents and votes to reverse and grant a new trial as to the defendants Goldis and Schorr.

DORE, J. (dissenting). In view of the closeness of the question of the guilt of the defendants Goldis and Schorr, the concededly

erroneous receipt of evidence from the witness Hartman concerning his conversation with " one of the Schorrs " going as it did to the heart of the accusation was prejudicial reversible error.

As the evidence developed, there was no claim that the defendants Goldis and Schorr were connected with the consummation of the conspiracy except as to the strike in the Mur-Ray Baking Company. The other defendants, except the defendant Ehrlich, who was acquitted, were claimed to be connected with the making of the conspiracy and all the occurrences in connection therewith. The members of Ehrlich's union as well as Local 138 went on strike against the Mur-Ray Company. From the testimony it is evident that the Mur-Ray Company was using so-called " jobbers " as a subterfuge to avoid the unionization of their drivers. It was also shown that prior to any of the trouble between the United and Mur-Ray, Local 138 was constantly organizing the drivers for the various baking companies. Prior to the alleged conspiracy strikes had been called and negotiations conducted for the entirely legitimate purpose of unionizing the industry and efforts had been made to unionize the Mur-Ray Baking Company. People's witness Levinson testified that his shop had been picketed both before he joined the United and while he was a member of the United and that the picketing had stopped when he had explained to Goldis and Schorr that he employed only relatives and boys as helpers and that he worked himself, and to the date of the trial he had not been unionized. People's witness Christ Makris testified that before the United had issued its price list efforts were made to unionize his shop many times and that Local 138 had thus endeavored to unionize his place long before he ever heard of the United and he stated that when he went with Rubinstein to Local 138 during the strike in his place Schorr rebuked him for bringing Rubinstein there and stated he was not any good to him, using violent language. Rubinstein also had testified that he had tried to arrange a strike with Goldis and Schorr with regard to the Mur-Ray Company but they had rejected his proposal and threatened to throw him out of their office. People's witness Elfenbein testified that before there was any talk about forming the United a strike had been declared against him both by the bakers' and the teamsters' unions and the strike continued for seven weeks.

If Mur-Ray sold to non-union jobbers or used alleged " jobbers " as drivers there was nothing illegal in Local 138 calling a strike. Otherwise all the bakeries could substitute so-called " jobbers " in place of drivers and thus prevent the unionization of the industry. There is no claim that the picketing was not peaceful.

Nor is there any direct evidence that either the $500 or the $400 originally collected ever went to Goldis and Schorr. It was traced to Max Silverman and Rubinstein's own testimony would indicate that it might not have been passed any further. There was, however, direct evidence by Rubinstein as to the payment of $200. If this is corroborated the conviction of Goldis and Schorr is justified. The People relied on circumstantial evidence and telephone wire-tapping for corroboration. The circumstances are that although Local 138 had declined to call a strike against Mur-Ray, previously a strike was called a short time after Max Silverman had been paid money. The force of this is considerably weakened by reason of the fact that Mur-Ray and its predecessor had been threatened with labor trouble by Local 138 long before and there was, as indicated, a dispute of long standing as to whether the Mur-Ray drivers were employees who should be unionized by the teamsters' union or were " jobbers " who bought from Mur-Ray and resold to their own customers and, therefore, were not teamsters.

Police Officer McGlynn, who testified to the telephone wire-tapping, identified Rubinstein's voice but not the voices claimed to be speaking from the union headquarters. The difficulty with this testimony (assuming it was competent) is that it is not in any way an admission by either Goldis or Schorr; for McGlynn was not able to identify the voices of either. Indeed, his identification of the voice of Rubinstein was based on conversations he had overheard with Rubinstein a year and a half after the wire-tapping.

There was also introduced in evidence the telephone conversation, hereinabove referred to, between one Hartman of the Mur-Ray Company and " one of the Schorrs." Hartman was permitted to testify that he had a telephone conversation with " one of the Schorrs," not knowing which one he was talking to. The substance of this conversation was that when Hartman, an officer of the Mur-Ray Company, announced he was ready to sign up his ten drivers or jobbers with the union he was told over the phone by one of the Schorrs that it would cost $250 each as an initiation fee. It was clearly improper to receive evidence of a talk with " one " of the Schorrs against the defendant Sam Schorr and the testimony could not be justified on the theory that Max Schorr was the agent for Sam Schorr. The receipt of this evidence was particularly harmful as it may strongly have affected the minds of the trial justices in resolving the question whether Rubinstein's evidence had been corroborated.

Under the circumstances we should not overlook this error or hold it harmless, especially in view of the nature of the testimony

given by the People's main witness, Rubinstein. He was concededly a co-conspirator who conceived the idea of the organization and the whole conspiracy charged. He had been convicted of a similar crime in June, 1936, for which he had been sentenced to an indeterminate term in the penitentiary which the Parole Board had fixed at thirty months. He was a self-confessed perjurer who had " jumped " bail after his prior conviction in Brooklyn had been affirmed by the Appellate Division of the Second Department. (People v. Rubinstein, 246 App. Div. 640.) With regard to his own veracity, he had testified: " I lied left and right if I had to lie, if I had to earn something by lying, I lied." He further testified that he would lie " left and right " to earn something to support his children, and further swore: " No, I don't like to tell the truth. I never did," and stated he still had the habit of lying, " Absolutely." He also stated that he made what he called a " bargain " before he would give testimony. It was shown that after he had served about eight months of his thirty months in the penitentiary his sentence was reduced to the time served and he was kept in jail only as a material witness and received three dollars a day. In addition, through an arrangement made, his family was receiving from a charitable organization $140 a month, which at the time of the trial had been paid for five or six months. Thus Rubinstein and his family during the period that he was held as a material witness received the sum of $230 a month. It is true that in spite of all this his credibility was an issue for the triers of the fact. Nevertheless as an admitted accomplice the defendants could not be convicted on his uncorroborated testimony but this would have to be supported by such other evidence as tended to connect the defendants with the commission of the crime. (Code Crim. Proc. § 399.) The corroboration as to the defendants Goldis and Schorr was insufficient and the erroneous admission of the testimony of Hartman prejudicial.

For the reasons stated I dissent from the majority opinion to the extent of voting to reverse the judgment against defendants Goldis and Schorr and to grant a new trial.

Judgment as to defendants Benjamin N. Spevack and Harold Silverman unanimously affirmed. Judgment as to the defendants William Goldis (alias Wolfie Goldis) and Samuel Schorr affirmed.